IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

WESTERN DIVISION

CASEY MORGAN, et al.                                    PLAINTIFFS

V.                          CIVIL ACTION NO. 5:22-cv-89-DCB-BWR

JOSEPH LOGAN SEWELL, JR., et al.                       DEFENDANTS

<u>ORDER</u>

BEFORE THE COURT are Casey Morgan and Jimmy Ward (collectively, "Plaintiffs")'s Motion for Partial Summary Judgment ("Plaintiffs' Motion") [ECF No. 65]; Joseph Sewell, Jr., Sewell Investments, LLC ("SI"), Logan N. Sewell, Colorado Buck Family, LP ("CBF"), Hard Times Plantation, Inc. ("HTP"), and Moss Grove Plantation, LLC ("MGP") (collectively, "Defendants")'s Motion for Partial Summary Judgment ("Defendants' Motion") [ECF No. 69]; and Defendants Motion to Exclude the Expert Testimony of Westley Winborne ("Expert Motion") [ECF No. 67]. The Court, having examined the submissions of the parties, the record, the applicable legal authority, and being fully informed in the premises, finds as follows:

## I. Factual and Procedural Background

This action stems from the negotiations and purchase of stock in Bigfoot Land Services, Inc. ("Bigfoot"), a land services company owned and operated by Plaintiffs in Oklahoma. [ECF No. 1].

In the fall of 2021, Jimmy Ward expressed a desire to sell Bigfoot and asked Colorado Buck (his father) if he knew any interested parties. [ECF No. 65-2] at 90. Joe Sewell (a family friend) called Ward a few days later to discuss the transaction. [ECF No. 70] at 6. During these negotiations, Ward and Robert Langdon (Bigfoot's accountant) forwarded several financial documents to Calvin Bontrager, Joe Sewell's representative, as part of Defendants' due diligence process.[1] Id. at 7.

Plaintiffs subsequently backed out of negotiations when Bigfoot acquired several large subcontracts, and Defendants believed the transaction was over at that point. Id. at 8. Plaintiffs allege they backed out of the deal because one of the subcontracts was with Kiamichi Electric Co-Op, a prominent electric utility company in Oklahoma, that had the potential to increase the value of Bigfoot. [ECF No. 66] at 2-3.

A few months later, Plaintiffs restarted negotiations with Defendants and proposed a $3 million valuation of Bigfoot. [ECF No. 66-2] at 189-91; [ECF No. 69-5] at 33. Afterwards, Bigfoot's accountant, Langdon, forwarded several financial documents at the request of Defendants' Certified Public Accountant ("CPA"), Chris

---

[1] Plaintiffs allege these documents included "tax returns, a fixed asset list, a list of then-current subcontractors and contracts in place, accounts receivable and payable schedules, summarized wages, a depreciation schedule to value Bigfoot's equipment, and any other information they requested." [ECF No. 66] at 2. Defendants allege they only received "copies of Bigfoot's 2018, 2019, and 2020 tax returns" during the initial negotiations. [ECF No. 70] at 7.

Kemp,[2] including a 2021 Income Statement that indicated gross revenue of $1,601,766.43 and net income of $691,469.01. [ECF No. 69-1]; [ECF No. 69-5] at 27-28; [ECF No. 69-12].

After conducting a valuation analysis with the financial documents forwarded by Langdon, Kemp concluded that Bigfoot had an average value of approximately $2,178,000. [ECF No. 70] at 10. Defendants also sent the financial documents to United Mississippi Bank's Chief Credit Officer, who underwrote the loan necessary for the acquisition of Bigfoot, and to Sim Mosby, Joe Sewell's personal CPA. [ECF No. 70-11]. Neither the CPAs nor the Bank CCO found any red flags related to Bigfoot's profitability.

On June 3, 2022, Plaintiffs sold the entirety of their shares of stock in Bigfoot to SI, Logan Sewell, and CBF. [ECF No. 1] at 2-3; [ECF No. 70] at 11; [ECF No. 1-1]. Under the terms of the Purchase and Sale Agreement (the "Agreement"), Plaintiffs were required to deliver "all of the stock in Bigfoot, along with all of the rights attendant thereto in exchange for the payment of

---

[2] Kemp requested the following financial records from Langdon:
    a. Bigfoot's last three years tax returns and financial statements;
    b. Bigfoot's fixed asset list;
    c. The current contracts in place for Bigfoot;
    d. Bigfoot's current accounts receivable schedule;
    e. Bigfoot's current accounts payable schedule;
    f. Bigfoot's current employee list and accompanying IRS Form W-2s and W-3s; and
    g. A list of current subcontractors for Bigfoot.
[ECF No. 69-10].

$2,770,140.96." [ECF No. 70] at 11; see also [ECF No. 1-1] at 1-2.

Defendants' payment in consideration consisted of the following obligations:

(1) Upon execution of this agreement, the sum of Two Hundred Thousand ($200,000.00) shall be paid to the Sellers, divided into equal shares payable to Casey Morgan and Jimmy Ward.

(2) At Closing, the sum of One Million Seven Hundred and Fifty Thousand Dollars ($1,550,000.00) shall be delivered to the Sellers, with Nine Hundred Thousand Dollars ($900,000.00) of said sum to be distributed to Casey Morgan, and Six Hundred and Fifty Thousand Dollars ($650,000.00) of said sum to be distributed to Jimmy Ward.

([3]) At Closing, the Purchasers shall execute a Promissory Note in favor of Casey Morgan and a Promissory Note in favor of Jimmy Ward, each of said Promissory Notes being for the sum of Three Hundred Eight[y] Five Thousand Seventy Dollars and Forty Eight Cents ($385,070.48). . . .

([4]) At [C]losing, Sewell Investments, LLC, shall execute a Promissory Note in favor of Jimmy Ward for the sum of Two Hundred and Fifty Thousand Dollars ($250,000.00). . . .

([5]) At Closing, Joseph Logan Sewell, Jr., individually, Sewell Investments, LLC, Hard Times Plantation, Inc., and Moss Grove Plantations shall execute Commercial Security Agreements and/or Mortgages, securing the financial obligations represented by the above described Promissory Notes. . . .

[ECF No. 1-1] at 2-3; [ECF No. 73] at 4-5. The Agreement also contained two clauses relevant to this matter: one clause that granted Defendants access to Bigfoot's books and records to perform their valuation analysis of the company, and another clause that required Plaintiffs to modify the promissory notes executed in consideration of the Agreement if Bigfoot failed to garner $4,000,000 in in gross revenue. [ECF No. 1-1] at 6; Id. at 9.

After the acquisition, the Defendants realized that Bigfoot was operating at a loss and approached Plaintiffs to discuss their concerns. [ECF No. 70] at 3. Plaintiffs then hired a third-party CPA, Michael Wright, to prepare a 2021 Income Statement and Tax

Return.[3] Id. at 3. The Wright statement indicated gross revenue of $1,123,747.05 and net income of $164,010.49. [ECF No. 69-3]. Likewise, the 2021 tax return drafted by Wright indicated that Bigfoot was operating at a net taxable loss of $71,599.00. Id.

Defendants subsequently mailed a letter dated October 7, 2022, alleging that Plaintiffs fraudulently misrepresented Bigfoot's valuation and demanding that Plaintiffs "rescind the Purchase and Sales Agreement and return all exchanged considerations **on or before October 14, 2022**." [ECF No. 1-6] at 1 (emphasis in original). The letter further asserted that "there is no outcome here wherein this Purchase and Sales Agreement survives, and no possibility that my clients will simply accept the outcome of your prior actions." Id. at 2.

Plaintiffs commenced this action against Defendants on November 4, 2022, in the United States District Court for the Southern District of Mississippi, intending to enforce the Agreement. [ECF No. 1] at 1-6. Plaintiffs assert that Defendants breached the Agreement by failing to pay Plaintiffs $85,000 for work Bigfoot performed prior to the sale and making purchases on the company credit card under Mr. Morgan's credit without authorization. Id. at 3-4. Plaintiffs further contend that

---

[3] Defendants allege that Wright's prepared documents were not known until Plaintiffs produced the work in a discovery request on July 13, 2023. [ECF No. 69-19].

Defendants defaulted on the Promissory Note executed in Ward's favor and repudiated the Agreement with their demand to rescind the Agreement via the Demand Letter dated October 7, 2022. [ECF No. 1] at 4-6; [ECF No. 1-6].

On November 19, 2022, Defendants answered and filed a counterclaim for actual and constructive fraud, fraudulent inducement, rescission, breach of contract, unjust enrichment, and civil conspiracy. [ECF No. 8]. Specifically, Defendants propose that Plaintiffs provided materially false representations concerning Bigfoot's financial standing during negotiations. Id. at 13. That same day, Defendants moved to change venue to the Eastern District of Oklahoma [ECF No. 9], which this Court denied in an Order entered on February 15, 2023. [ECF No. 28].

## II. Motions for Summary Judgment

On January 23, 2024, both parties filed dueling Motions for Partial Summary Judgment. [ECF No. 65]; [ECF No. 69]. Plaintiffs' allegations rest on Defendants' alleged breach and anticipatory repudiation of the Agreement. [ECF No. 66]. Plaintiffs further aver that Defendants fail to assert valid fraud claims to survive summary judgment. Id. at 6. Defendants' Motion seeks rescission of the Agreement, contending that Plaintiffs committed fraud by offering alleged materially false representations prior to the agreement. [ECF No. 70] at 4.

7

A. Legal Standard

In a motion for summary judgment, the movant must show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." Id. A party cannot defeat a properly supported summary judgment motion by directing the Court to conclusory allegations or presenting only a scintilla of evidence. Lincoln v. Scott, 887 F.3d 190, 195 (5th Cir. 2018). Instead, the non-movant must "identify specific evidence in the record and . . . articulate the precise manner in which that evidence supports his or her claim." Ragas v. Tenn. Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998) (citing Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir.), cert. denied, 513 U.S. 871 (1994)).

The evidence must be viewed in a light most favorable to the nonmoving party. Vann v. City of Southaven, Miss., 884 F.3d 307, 309 (5th Cir. 2018); Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P., 627 F.3d 134, 138 (5th Cir. 2010). The Court neither assesses credibility nor weighs evidence at the summary-judgment stage. Wells v. Minnesota Life Ins. Co., 885 F.3d 885, 889 (5th Cir. 2018). Summary judgment must be rendered when the nonmovant

8

"fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

B. Analysis

1. Plaintiffs' breach of contract claim

To state a breach of contract claim, "a plaintiff must show: 1) formation of a contract; 2) breach of the contract; and 3) damages as a direct result of the breach." Bayro v. State Farm Fire & Cas. Co., 2015 WL 4717166, at *1 (W.D. Okla. Aug. 7, 2015) (citing Digital Design Group, Inc. v. Information Builders, Inc., 24 P.3d 834, 843 (Okla. 2001)).

Plaintiffs' Motion first asks the court to grant summary judgment on Plaintiffs' breach of contract claim regarding Defendants' failure to pay the $85,000.(?) for work performed prior to the sale; [ECF No. 65-1] at 346-47; Defendants' purchases on the company credit card on Morgan's credit without authorization; Id. at 346-47; and Defendants' default on the promissory notes and repudiation of the contract via the demand letter dated October 7, 2022. [ECF No. 1-2]; [ECF No. 1-4]; [ECF No. 1-6]. This Court will analyze these claims in that order.

i. Whether Defendants breached by failing to pay the $85,000

9

Plaintiffs allege that they performed work prior to the completed transaction, and that Defendants informed Morgan and Ward that Plaintiffs were owed an amount "substantially" lower than the alleged $85,000 spent prior to the sale. [ECF No. 65-1] at 205. Defendants contend that Plaintiffs wholly rely upon this deposition testimony in support of their breach claim and fail to consider the full record. [ECF No. 77] at 10.

Plaintiffs are correct in that Defendants bear the burden of showing "specific evidence in the record and articulat[ing] the precise manner in which that evidence supports his or her claim," Ragas, 136 F.3d at 458, but it appears that Defendants satisfied this burden. For example, Defendants cited the June 2022 meeting, whereby Defendants detailed expenses paid by Defendants and Bigfoot after execution of the Agreement allegedly related to the $85,000 payment from Kiamichi. [ECF No. 76-2] at 59-62. Next, Defendants offer Morgan's deposition testimony, showing that Plaintiffs admitted that the $85,000 was subject to some "deductions." [ECF No. 76-17] at 211. Finally, Defendants showed that Wright was hired by Plaintiffs to audit Bigfoot's books to consider what and whom was owed regarding the $85,000 at issue. [ECF No. 77] at 13; [ECF No. 76-17] at 202. Accordingly, the Court concludes that Defendants have cited specific facts in the record establishing a genuine issue of material fact as to the claimed $85,000, and summary judgment as to this fact is denied.

ii. Whether Defendants breached by use of the company credit card

Next, Plaintiffs argue that Defendants made purchases on the company credit card on Morgan's credit without authorization. [ECF No. 65-1] at 346-47. Defendants respond in opposition with several facts. [ECF No. 77] at 14-15.

First, Defendants cite Morgan's deposition, showing that the credit card account at issue was also in Bigfoot's name, and that the financial institution that issued the card could also pursue Bigfoot to collect on the debt. [ECF No. 76-17] at 344. Next, Defendants propose that they were aware that the credit card was only used for repair and maintenance expenses but did not expect a balance of nearly $30,000 after only two months. [ECF No. 76-23]. Finally, Defendants show that Morgan consented to Bigfoot's continued use of the credit card until Bigfoot could either complete a credit card transfer or issue a new card, which required Morgan's authorization. [ECF No. 76-24]. Accordingly, the Court finds that Defendants have cited specific facts establishing a genuine issue of material fact as to the credit card purchases and they survive summary judgment as to this claim.

iii. Whether Defendants breached the promissory note obligations

"A promissory note is a negotiable instrument and a negotiable instrument is a contract." Wells Fargo Bank, N.A. v. Heath, 280 P.3d 328, 334 (Okla. 2012). Therefore, Plaintiffs must show the elements of a breach of contract claim to show breach of the promissory note obligation.

In support of their breach claim, Plaintiffs cite the acceleration clause contained in the promissory notes, "entitling Plaintiffs to the full amount due if Defendants defaulted." [ECF No. 80] at 4. It is undisputed that the promissory notes were properly entered. Defendants further admit that they did not make any payments pursuant to the promissory notes. But the Agreement also contains a "Performance Pledge" clause, which required Plaintiffs to modify the notes if Bigfoot failed to earn $4,000,000 in gross revenue during the first twelve (12) months of Defendants' ownership. [ECF No. 1-1] at 9.

Plaintiffs argue that Defendants did not "propose . . . alternative and reasonable terms to pay the notes." [ECF No. 80] at 4. But Defendants had no such burden pursuant to the terms of the Agreement; instead, it was up to Plaintiffs to modify repayment terms, and there is no evidence that Plaintiffs attempted to do so. See [ECF No. 1-1] at 9 ("Should financial performance fall short . . ., [Plaintiffs] hereby agree to modify the Promissory Note in favor of Casey Morgan and a Promissory Note in favor of

Jimmy Ward . . . by extending the repayment periods for same.”). Upon review of the Agreement and the promissory notes, there appears to be a genuine dispute of material fact as to whether Defendants were entitled to withhold repayment because of the “Performance Pledge” clause.

iv. Whether Defendants repudiated the Agreement via the demand letter dated October 7, 2022

“Under Oklahoma law, a party repudiates a contract by declaring its intention not to perform, which may relieve the other party from performance.” Allianz Life Ins. Co. v. Muse, 2022 WL 3701606, at *11 (10th Cir. 2022) (citing Bushey v. Dale, 75 P.2d 193, 195 (Okla. 1937)). Refusal to perform must be “distinct, unequivocal, and absolute in terms and treated and acted upon as such by the other party.” Bushey, 75 P.2d at 196. “[M]ere expressions of dissatisfaction with the contract, or of a desire to rescind it, or of reluctance to perform it, or of intention to refuse to perform, in the absence of absolute refusal itself,” are not sufficient to constitute repudiation. Id.

Plaintiffs contend that Defendants’ counsel’s demand letter “accusing [Plaintiffs] of fraud and demanding rescission goes beyond mere dissatisfaction.” [ECF No. 80] at 8 (citing [ECF No. 1-6] at 2). Defendants maintain that the letter falls short of repudiation because the letter only represented an intent to file

13

a lawsuit but that Defendants still operated Bigfoot pending the outcome of this matter. [ECF No. 77] at 25. Alternatively, Defendants argue that a contract entered upon fraudulent representations or conduct cannot be enforced if the party seeking rescission was materially misled by such representations or conduct. Id. (citing Prescott v. Brown, 120 P. 991, 993-94 (Okla. 1911)).

First, the demand letter contains the following language: "To state this plainly, there is no outcome here wherein this Purchase and Sales Agreement survives, and no possibility that my clients will simply accept the outcome of your prior actions. We either receive a return of [Defendants] funds, or we obtain a judgment from the Court entitling us to the same." [ECF No. 1-6] at 2. This language goes beyond mere dissatisfaction; instead it shows Defendants' absolute refusal to honor the Agreement. See, e.g., Ferrell Const. Co., Inc. v. Russell Creek Coal Co., 645 P.2d 1005, 1007-08 (Okla. 1982) (sending letter declaring agreement cancelled constituted repudiation); Bourke v. W. Bus. Prod., Inc., 120 P.3d 876, 885-86 (Okla. Civ. App. 2005) (announcing intention not to perform obligation under stock purchase agreement and telling opposing parties they could "tear the agreement up" constituted sufficient evidence of repudiation).

The Court also recognizes that the doctrine of anticipatory repudiation requires a valid bilateral contract. To this extent, Defendants argue that "[a]nticipatory repudiation following the identification of fraud does not vitiate the defense of fraud. . . ." [ECF No 77] at 24. "Where a person positively makes false representations as an inducement for another to contract with him, and such person, relying wholly upon such false representations, enters into a written contract, the contract is voidable for fraud, although the false representations were innocently made." Prescott, 120 P. at 994 (citation omitted).

As this Court finds below, there is a genuine dispute of material fact concerning whether Plaintiffs were aware of the accounting mistake. Accordingly, Defendants' fraud claims remain, and Plaintiffs' Motion seeking judgment on their breach of contract regarding Defendants' alleged repudiation is denied.

2. Defendants' fraud claims

Plaintiffs first argue that Defendants fail to establish actual fraud because the evidence shows that Plaintiffs lacked the requisite intent to commit actual fraud. [ECF No. 66] at 6-7. Plaintiffs cite Defendants' deposition testimony which suggests that Plaintiffs did not have personal knowledge of the alleged misrepresentations. Id. at 7. Defendants maintain that, under Oklahoma law, evidence of actual fraud can be found, even though

15

Plaintiffs lacked the requisite knowledge or the intent to deceive. [ECF No. 77] at 23. Alternatively, Defendants allege that Plaintiffs acted in reckless disregard of the truth because of their ignorance to Bigfoot's true financial standing. [ECF No. 84] at 15.

Under Oklahoma law,[4] Defendants must show that Plaintiffs made a false material representation either knowingly or with reckless disregard for the truth. See Bowman v. Presley, 212 P.3d 1210, 1218 (Okla. 2009) (To prevail on an actual fraud claim, a party must show "1) a false material misrepresentation, 2) made as a positive assertion which is either known to be false or is made recklessly without knowledge of the truth, 3) with the intention that it be acted upon, and 4) which is relied on by the other party to his (or her) own detriment."); Faulkenberry v. Kansas City S. Ry. Co., 602 P.2d 203, 206 (Okla. 1979) ("Actual fraud is the intentional misrepresentation or concealment of a material fact which substantially affects another person. . . .").

Under this theory, Defendants bear the burden to prove, by clear and convincing evidence, that Plaintiffs acted with knowledge of falsity or reckless disregard for the truth. See Simon v. Metro. Prop., 2014 WL 12479649, at *6 (W.D. Okla. 2014).

---

[4] This Court applies Oklahoma law in this diversity action pursuant to the Agreement. See [ECF No. 1-1].

"Although fraud is never presumed, . . . it may be proved by circumstantial evidence." See also Liberty Lobby, 477 U.S. at 252, 106 S. Ct. 2505 ("The mere existence of a scintilla of evidence in support of the [claimant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [claimant].")); K-B Trucking Co. v. Riss Int'l Corp., 763 F.2d 1148, 1157 (10th Cir. 1985) (recognizing that when state law permits a showing of fraud by circumstantial evidence, fraud "may be proved by showing circumstances from which the inference of fraud is natural and irresistible" (internal quotation marks omitted)).

"To constitute actual fraud, there must be an intentional deception." Sutton v. David Stanley Chevrolet, Inc., 475 P.3d 847, 853 (Okla. 2020) (citing Faulkenberry, 602 P.2d at 206 n.6 (Okla. 1979)). After a review of Oklahoma law, it appears at this stage that Defendants have not met their burden to show that Plaintiffs committed actual fraud. The Court cannot find any evidence in the record to suggest that Plaintiffs intended to deceive Defendants during negotiations, although additional evidence may emerge. To the extent that Defendants allege recklessness, the Court believes Plaintiffs' conduct falls short because Plaintiffs show that the incorrect 2021 Income Statement was an accounting error that their Accountant admitted was a mistake. [ECF No. 66] at 9. At best, this conduct appears to be negligence.

But the Court's analysis of fraud does not stop here because Oklahoma law recognizes fraud can be actual or constructive. To establish a claim for constructive fraud, Defendants must show that Plaintiffs owed them some duty. See Okla. Stat. tit. 15, § 59.[5] Specifically, Defendants must show:

(1) That the defendant owed plaintiff a duty of full disclosure. This duty could be part of a general fiduciary duty owed by the defendant to the plaintiff. This duty could also arise, even though it might not exist in the first instance, once a defendant voluntarily chooses to speak to plaintiff about a particular subject matter;

(2) That the defendant misstated a fact or failed to disclose a fact to plaintiff;

(3) That the defendant's misstatement or omission was material;

(4) That plaintiff relied on defendant's material misstatement or omission; and

---

[5] Under Oklahoma law, constructive fraud occurs:
　　1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or,
　　2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud.
Okla. Stat. tit. 15, § 59.

(5) That plaintiff suffered damages as a result of
defendant's material misstatement or omission.

Specialty Beverages, L.L.C. v. Pabst Brewing Co., 537 F.3d 1165
(10th Cir. 2008) (citing Lillard v. Stockton, 267 F.Supp.2d 1081,
1113 (N.D. Okla. 2003)). "There is no requirement, however, that
the [Defendants] prove that [Plaintiffs] acted with the intent to
deceive." Id. (citations omitted).

"[T]here must be evidence of each element of fraud presented
before the issue may be submitted to the jury." P.E.A.C.E. Corp.
v. Okla. Natural Gas Co., 568 P.2d 1273, 1277 (Okla. 1977).
"[B]ecause fraud is never presumed, the mere allegation of fraud
alone will not justify the submission of that issue to the jury
unless facts are produced from which an irresistible deduction of
fraud reasonably arises.'" Roberts v. Wells Fargo AG Credit Corp.,
990 F.2d 1169, 1173 (10th Cir. 1993) (quotations, citation
omitted). "The existence of fraud, given evidence for each element,
is a question of fact for the jury." Murray v. D & J Motor Co.,
958 P.2d 823, 831 (Okla. Civ. App. 1998) (citing Silk v. Phillips
Petroleum Co., 760 P.2d 174 (Okla. 1988)).

The main issue at this point of the litigation is whether
Plaintiffs breached a duty of full disclosure during negotiations.
Plaintiffs maintain that this matter was an arms-length
transaction, and no fiduciary or confidential relationship existed

between the parties. [ECF No. 66] at 8. Alternatively, Plaintiffs argue that Defendants fraud claims are barred by the doctrine of caveat emptor. Id. at 10. Defendants contend that Plaintiffs breached a confidential relationship with Defendants by entering into negotiations with Defendants, exchanging fraudulent financial documents with Defendants, and failing to fully disclose the financial standing of Bigfoot. [ECF No. 70] at 23-30.

"Under Oklahoma law, a claim for constructive fraud requires a showing that the defendant owed some form of duty to the plaintiff, such as a fiduciary duty or a 'duty based upon a confidential relationship or a special relationship of trust.'" Roberts Ranch Co. v. Exxon Corp., 43 F. Supp. 2d 1252, 1259 (W.D. Okla. 1997) (quotation and footnote omitted). A fiduciary relationship compels an absolute duty on the parties to disclose all material facts. Barry v. Orahood, 132 P.2d 645, 647 (Okla. 1942). "Where there is no fiduciary relationship[,] a legal or equitable duty to disclose all material facts may arise out of the situation of the parties, the nature of the subject matter of the contract, or the particular circumstances surrounding the transaction." Sutton, 475 P.3d at 854 (citing Croslin v. Enerlex, Inc., 308 P.3d 1041, 1047 (Okla. 2013)).

In Emergency Services of Oklahoma, PC v. Aetna Health, Inc., the district court noted that negotiations of a contract may give

rise to a duty necessary to meet the first element of a constructive fraud claim. 580 F. Supp. 3d 1032, 1037 (W.D. Okla. 2022). But no duty to speak arises where the circumstances of the relationship is merely pursuant to an arms-length commercial transaction. See Silver v. Slusher, 770 P.2d 878, 882 n.11 (Okla. 1988) (parties to a strict "arms-length" transaction do not have any special relationship creating a duty to support a constructive fraud claim).

First, this Court must consider whether Plaintiffs owed a duty to fully disclose Bigfoot's profitability to Defendants during negotiations. Although there is no general fiduciary duty applicable in this matter, Defendants argue that a special, confidential relationship existed between the parties so as to impose a duty to fully disclose in the absence of a formal fiduciary relationship. [ECF No. 70] at 27. Specifically, Defendants allege that the familial relationship between Ward and Buck and the friendly business relationship between Joe Sewell, Ward, and Buck permitted Defendants to "place[] immense trust and confidence . . . in Ward." Id. at 28. Plaintiffs maintain that a confidential relationship is typically an element in consideration of whether a party exerted undue influence over another. [ECF No. 73] at 10-11. Even if these relationships constitute a confidential relationship, Plaintiffs argue that the relationships do not reach the standard confidential relationship. Id. at 11.

Oklahoma law recognizes "a fiduciary duty arising out of a commercial contract if the transaction involved facts and circumstances indicative of the imposition of trust and confidence, rather than facts and circumstances indicative of an arms length commercial contract." Quinlan v. Koch Oil Co., 25 F.3d 936, 942 (10th Cir. 1994) (citing Devery Implement Co. v. J.I. Case Co., 944 F.2d 724, 730 (10th Cir. 1991)). The Oklahoma Supreme Court, noting that confidential and fiduciary relations are generally synonymous, explained as follows:

> "Confidential relation" is not confined to any specific association of parties. It appears when the circumstances make it certain the parties do not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible. Where one is bound to act for the benefit of another, he can take no advantage to himself. No precise language can define the limits of the relation; it generally exists between trustee and cestui que trust, guardian and ward, attorney and client, and principal and agent. In such cases, the "confidential relation" is a conclusion of law. . . .

In re Estate of Beal, 769 P.2d 150, 155 (Okla. 1989) (quoting In re Null's Estate, 302 Pa. 64, 153 A. 137 (1930)). Beal observed that confidential relationships can exist between bank officer and borrower, employer and employee, and brothers. Id. at 155.

Although "[a] confidential relationship does not necessarily arise by the mere fact of the relation of parent and child," Ellis v. Potter, 455 P.2d 92, 95 (Okla. Civ. App. 1969), the existence of a confidential relationship "between a parent and child is a question of fact." Id. In Ellis, the Oklahoma Court of Appeals affirmed the finding of a confidential relationship in a fraud and undue influence action between a physically and mentally deficient mother and her son by considering the nature of communications between the pair and the business opportunity the mother provided to the son. Id.

Here, Defendants maintain that Buck and Ward are a father and son with a "strong and loving relationship" who communicate often and had also been involved in previous business dealings. [ECF No. 70] at 6; Id. at 28. Defendants further cite deposition testimony indicating that Ward told Buck that he would make considerable passive income following the sale. [ECF No. 77] at 28. As for Joe Sewell and Ward, Defendants allege that the parties had a friendly business relationship for many years. [ECF No. 70] at 5-6.

Upon review of the record and applicable law, the Court at this stage cannot find the existence of a confidential relationship. Statements concerning Bigfoot's profitability could be viewed as salesmanship in an arms-length transaction and not an opportunity to exert influence over Defendants. Moreover, Defendants appear to be savvy businessmen in their own right and likely are not weak and dependent upon Plaintiffs words and conduct. Accordingly, the Court, for the purpose of resolving the issue presently before it, cannot find the existence of a confidential relationship between the parties.

Defendants next argue that Plaintiffs owed a duty of full disclosure because Plaintiffs made verbal representations that Defendants would receive considerable passive income but did not fully illustrate the financial standing of Bigfoot. [ECF No. 70] at 25.

A claim of constructive fraud based on a nondisclosure of information requires the existence of a duty to disclose the information due to the "peculiar circumstances" of a particular case. See Thrifty Rent-A-Car Sys., Inc. v. Brown Flight Rental One Corp., 24 F.3d 1190, 1195 (10th Cir. 1994); see also Specialty Beverages, 537 F.3d at 1181; Silk, 760 P.2d at 179; Varn v. Maloney, 516 P.2d 1328, 1332 (Okla. 1973).

In Uptegraft v. Dome Petroleum Corp., the Oklahoma Supreme
Court held that a duty of disclosure could arise not only from a
general fiduciary duty but also where a party selectively discloses
facts that create a false impression. 764 P.2d 1350, 1353 (Okla.
1988). A person "conveying a false impression by disclosing some
facts and concealing others is guilty of fraud, even though the
statement is true as far as it goes, the concealment is in effect
a false representation that what is disclosed is the whole truth."
Croslin, 308 P.3d at 1047 (citing Deardorf v. Rosensbusch, 206
P.2d 996, 998 (Okla. 1949)). This is because "the concealment is
in effect a false representation that what is disclosed is the
whole truth." Id.

Plaintiffs insist that they did not violate this duty because
the accounting error was a mistake that they were not aware of.
[ECF No. 73] at 8. "Though one may be under no duty to speak, if
he undertakes to do so, he must tell the truth, and not suppress
facts within his knowledge or materially qualify those stated."
Berry v. Stevens, 31 P.2d 950, 951 (Okla. 1934) (emphasis added).
See also Croslin, 308 P.3d at 1047 ("[W]here there is no duty to
speak, if a person undertakes to speak, he or she must disclose
all known facts.") (emphasis added); Specialty Beverages, 537 F.3d
at 1182 (finding that brewery did not fully disclose its
exclusivity agreement with another distributor during contract
negotiations); Sutton, 475 P.3d at 856-57 (finding that dealership

25

concealed arbitration clause contained in purchase agreement); Lazy S Ranch Prop., LLC v. Valero Terminaling and Distr. Co., 92 F.4th 1189, 1207 (10th Cir. 2024) (affirming that cattle operator failed to show that pipeline company knew of pipeline leak and failed to disclose the leak).

In Sutton, the Oklahoma Supreme Court declared that the duty owed is a "duty to disclose enough information that will clear the false impression created. . . ." 475 P.3d at 858 (Okla. 2020). Plaintiffs argue they satisfied this duty by providing Defendants all of the information necessary to evaluate Bigfoot before purchase.

Although the Court believes that Plaintiffs must be aware of the truth when the false impression occurs, the Court cannot determine at this point in the litigation whether Plaintiffs were unaware of the discrepancy in the 2021 Income Statement. Plaintiffs argue that Langdon, who prepared the document, "mistakenly reported transfers from savings accounts as income" and that Plaintiffs were not aware of Langdon's mistakes. [ECF No. 73] at 8. Plaintiffs also offer deposition testimony where Langdon stated that Plaintiffs did not try to inflate Bigfoot's value to push the sale forward. [ECF No. 80] at 7. On the other hand, Defendants point to the 2021 Income Statement prepared by Wright which identified the discrepancy. [ECF No. 70] at 3-4. Defendants also

show that Langdon filed a 2021 tax return in 2023 containing the same mistakes as the original 2021 Income Statement, even after Wright already prepared his 2021 Income Statement. Id. at 4. Upon review of the record and applicable law, there is a genuine dispute of material fact as to whether Plaintiffs were aware of the discrepancy.

To the extent that Plaintiffs breached a duty to disclose, Plaintiffs argue that Defendants fraud claims are barred by the doctrine of caveat emptor. [ECF No. 66] at 10. Plaintiffs specifically maintain that they provided all necessary financial documents and opportunities to investigate the business for Defendants to perform reasonable diligence prior to the sale. Id. at 11-12.

Defendants contend that they do not bear full responsibility to investigate the financial standing of Bigfoot if Plaintiffs fraudulently misrepresented the true value of the company. [ECF No. 77] at 32. Alternatively, Defendants allege they "went to great lengths to investigate and review the financial statements and other information provided by Plaintiffs." [ECF No. 84] at 21.

Where a party claims they relied on pre-contractual oral representations, the doctrine of caveat emptor will bar that party's fraud claims if they could have discovered the fraud by reading the contract or by exercising reasonable diligence. See

Felix v. Lucent Techs., Inc., 387 F.3d 1146, 1164-65 (10th Cir.
2004) ("Oklahoma law requires ... 'reasonable reliance' on
misrepresentations, and ... 'an action for fraud may not be
predicated on false statements when the allegedly defrauded party
could have ascertained the truth with reasonable diligence.'")
(quoting Silver, 770 P.2d at 882 n.8; Eckert v. Flair Agency, Inc.,
909 P.2d 1201, 1206 (Okla. Civ. App. 1995); see also Field v. Mans,
516 U.S. 59, 70-72 (1995) (comparing justifiable and reasonable
reliance); State ex rel. Sw. Bell Tel. Co. v. Brown, 519 P.2d 491,
495 (Okla. 1974) (explaining that the plaintiff's reliance must be
"justifiable").

        As this Court previously stated, it is unclear at this point
in the litigation whether Plaintiffs were aware of the concealed
information at issue. To the extent that this Court finds that
Plaintiffs fraudulently concealed the information, the Court
cannot determine whether Defendants performed the diligence
necessary to overcome the doctrine of caveat emptor because both
parties present competing testimony indicating the diligence
Defendants performed.[6]  Accordingly, the Court finds that

_____

[6] Compare [ECF No. 66] at 11 (providing deposition testimony indicating that
Plaintiffs provided the financial documents necessary to analyze the value of
Bigfoot and that Defendants did not visit Bigfoot prior to the sale to perform
an independent inspection) with [ECF No. 84] at 21 (providing evidence that
Defendants had two certified public accountants and a bank's Chief Credit
Officer review the financial documents prior to the sale).

Plaintiffs' Motion and Defendants' Motion seeking judgment on Defendants' fraud claims are denied.

## III. Motion to Exclude

The Expert Motion largely deals with matters concerning the admissibility of Winborne, Plaintiffs' expert witness. [ECF No. 67]. The focus of Defendants' arguments concerning Winborne's testimony centers on his conclusions and the reliability of the sources on which he bases his opinion. Defendants contend that Winborne's testimony must be based on not only experience but also some reliable objective methodology. [ECF No. 68] at 14-15. Defendants also allege that Winborne's testimony would be unfairly prejudicial and mislead the jury because the testimony improperly places a legal duty upon Defendants not recognized under Oklahoma law. Id. at 16.

Plaintiffs oppose the Motion by arguing that Winborne meets the standards of Rule 702, alleging he is more than qualified by his experience as a CPA, and that his opinions are demonstrably relevant and reliable and the product of the same methodology he employs in his day-to-day business as the managing partner of a construction accounting firm. [ECF No. 75].

## A. Legal Standard

The first step in determining the admissibility of expert testimony requires the Court to turn to the Federal Rules of Evidence ("Rule"). Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact at issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The language of Rule 702 reflects the Supreme Court's decision in Daubert v. Merrell Dow Pharm., Inc., wherein the Court charged trial courts with the responsibility of acting as gatekeepers to exclude unreliable expert testimony. 509 U.S. 579 (1993). Thus, to be admissible, expert testimony must be relevant as well as reliable. Id. at 589.

In making the determination as to the admissibility of expert testimony, there are several factors which a trial court must

consider: (1) whether the validity of the methodology is testable and has been tested; (2) whether the methodology has been subjected to peer review and publication; (3) whether the methodology has a known error rate; (4) whether there are accepted standards for using the methodology; and (5) whether the methodology is generally accepted. Id. at 593-94. In addition to the factors established by Daubert, the advisory committee notes following the 2000 amendment to the Rules, additional guideposts were established to assist trial courts in determining the admissibility of expert testimony and evidence: (1) whether experts are proposing to testify about matters growing naturally out of research they have conducted independent of litigation; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as he would be in his regular professional work; and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. FED. R. EVID. 702 advisory committee's notes to 2000 amendments (citations omitted).

Notwithstanding the Court's role as a gatekeeper against unreliable expert testimony, the Court is not "intended to serve as a replacement for the adversary system." United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi, 80 F.3d

1074, 1078 (5th Cir. 1996). As the Court in Daubert noted: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596.

The admissibility of expert testimony or evidence does not render it irrefutable. As the advisory committee notes state, "[w]hen a trial court ... rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable. [Rule 702] is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise." FED. R. EVID. 702 advisory committee's notes to 2000 amendments. Indeed, "it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." Daubert, 509 U.S. 590. Ultimately, a trial court's inquiry "is a flexible one," id. at 594, and the focus "must be solely on the principles and methodology, not the conclusions they generate." Id. at 595.

### B. Analysis

#### 1. Is Winborne qualified?

According to Winborne's Expert Witness Report, Winborne is a CPA with "over 20 plus years of experience providing audit,

accounting and tax services to numerous small and medium sized businesses and their owners." [ECF No. 74-2] at 1. These services include "litigation support, contract costing, strategic planning and related services." Id. at 1. Winborne also testified that he has provided services in transactions concerning the purchase and sale of construction businesses on approximately 80 different occasions. [ECF No 74-1] at 45.

Defendants argue that despite this experience, Winborne's theories are based on what Winborne would have done and not based on objective and reliable methodology. [ECF No. 82] at 2.

Having considered the parties' briefs on the qualifications of Winborne, the Court concludes at this stage that pursuant to Rule 702 he appears to be qualified to render his opinions on the relevant due diligence performed in a stock purchase based on his education as well as his experience, skill, and knowledge gained from his role as a managing partner of a construction accounting firm.  If Defendants' request, they will be allowed to challenge the witness at trial outside the presence of the jury regarding his qualifications, at which time the Court will make a final decision.

2. Is Winborne's testimony relevant and reliable?

It is undisputed that Winborne's opinions do not cite to any peer-reviewed publications, potential rates of error, or controls

used. Nor does he appear to have considered alternative theories in reaching his opinion on the due diligence procedures. However, his procedures can be tested.

As this Court previously stated, supra, an expert's opinion may be based on experience, skill, or other specialized knowledge, so long as his experience equips him with knowledge beyond that of the average layman. As the Supreme Court observed in Kumho, the objective of the Daubert gate-keeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 526 U.S. 137, 152 (1999).

Winborne's relevant field is that of providing accounting services in the sale and purchase of a company, including "litigation support, contract costing, strategic planning and related services." [ECF No. 74-2] at 1. Winborne submits that he employs the same kind of data and the same methodology as he had in assisting clients in the sale and purchase of similarly situated construction businesses [ECF No. 74-1] at 45. In his report, Winborne lays out the due diligence procedures, based on his 20 years of experience as a certified public accountant and his review of financial documents provided by Plaintiffs in relation to this matter, that he would perform in a similar matter. [ECF No. 67-

5]. Winborne proceeds to explain how the facts at hand are applied to the procedures he would have performed, and how he then analyzes the two in arriving at his conclusion. Id.

Defendants argue that Winborne's testimony is unreliable because it lacks the scientific methodology necessary for an expert. The Fifth Circuit recognizes there are some expert opinions not grounded upon exact scientific methodologies. United States v. Simmons, 470 F.3d 1115, 1123 (5th Cir. 2006) (quoting Jenson v. Eveleth Taconite Co., 130 F.3d 1287, 1297 (8th Cir. 1997)). "In such instances, other indicia of reliability are considered under Daubert, including professional experience, education, training, and observations." Id. See also Primrose Operating Co. v. Nat'l Am. Ins. Co., 382 F.3d 546, 562-63 (finding practicing attorney certified by State Board was qualified to give his opinion concerning value of services rendered); Fair v. Allen, 669 F.3d 601, 607 (5th Cir. 2012) (concluding that an expert giving nonscientific testimony may be excluded only if his opinion is "completely unsupported," and that the party opposing the testimony bears the burden to "expose that lack of reliability).

Defendants' objections to Winborne's testimony concern the credibility of his conclusions and the level of certitude of the procedures on which he relies. Defendants further argue that Winborne's testimony would impose a legal duty to perform due

diligence not recognized by Oklahoma law. [ECF No. 68] at 13. Upon review of the Expert Report, the Court is not convinced that this is the case; instead, it appears that Winborne is only describing the due diligence procedures he performs, including the kinds of data and methodologies he relies on, in his day-to-day business as he did in deriving his opinions in this case. As this Court already stated, <u>supra</u>, the admissibility of one expert's testimony does not exclude the testimony of a contradictory expert. Any objections to the conclusions of Winborne are best left to "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. . . ." <u>Daubert</u>, 509 U.S. at 596.

Moreover, an expert's testimony "must be relevant, not simply in the sense that all testimony must be relevant, FED. R. EVID. 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." <u>Bocanegra v. Vicmar Servs., Inc.</u>, 320 F.3d 581, 584 (5th Cir. 2003). "Relevance depends upon whether [the expert's] reasoning or methodology can be applied to the facts in issue." <u>Kirby Inland Marine</u>, 482 F.3d 347, 352 (5th Cir. 2007) (quotation omitted). The expert testimony must "fit" the case's facts. <u>Daubert</u>, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." <u>Id.</u> (quotation omitted).

At this stage, upon review of the Expert Report, the Court does not find that there is "too great an analytical gap between the data and the opinions proffered," and that Winborne's opinions "fit" with the facts of the case. See General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997). This matter stems from the stock purchase of a construction company, which typically involves financial and accounting matters not typically known by the general layman. The Agreement includes a clause indicating that Defendants agree to perform due diligence prior to the purchase, and that Plaintiffs would provide full access to Bigfoot's books and records to assist the due diligence process. Winborne is a certified public accountant with years of experience in the purchase and sale of similarly situated construction businesses. The very nature of Winborne's testimony involves the due diligence he would perform in his day-to-day business as the managing partner of a construction accounting firm. Accordingly, the Court concludes that Winborne's opinions on due diligence procedures are relevant and reliable in this matter.

After reviewing Defendants' arguments, the applicable law, and the evidence Defendants seek to exclude, the Court at this stage of the proceeding finds that Winborne's proposed testimony appears to be sufficiently relevant and reliable pursuant to Rule 702. Thus, the Court concludes that Defendants' Motion to Exclude [ECF No. 67] is denied at this time, but the Defendants will be

given an opportunity to challenge the witness at trial outside the presence of the jury regarding his qualifications, at which time the Court will make a final decision.

IV. Conclusion

Accordingly,

IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment [ECF No. 65] is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment [ECF No. 69] is DENIED.

IT IS FURTHER ORDERED that Defendants' Expert Motion [ECF No. 67] is DENIED.

SO ORDERED, this 24th day of April, 2024.

/s/ David Bramlette
DAVID C. BRAMLETTE III
UNITED STATES DISTRICT JUDGE